

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: February 07, 2024.**

_____
**CRAIG A. GARGOTTA
CHIEF UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 21-51531-CAG |
| | § | |
| HUNTER ROSS CARTER, | § | |
| | § | CHAPTER 7 |
| | § | |
| Debtor. | § | |

_____

| | | |
|---|---|---|
| JAMES ALLEN GUSE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADV. NO. 22-05041-CAG |
| | § | |
| HUNTER ROSS CARTER | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION

Plaintiff, James Allen Guse, filed the above-referenced adversary proceeding (the "Adversary Proceeding") in the above-referenced bankruptcy case (the "Bankruptcy Case") of Hunter Ross Carter (the "Defendant") to determine the dischargeability of a particular debt subject

1

to 11 U.S.C. § 523(a)(6)[1] of the Bankruptcy Code. On October 23 and 24, 2023, this Court conducted a multi-day trial on Plaintiff's Complaint,[2] and now grants Plaintiff a nondischargeable judgment.

## I. JURISDICTION

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) relating to this Court's determination of the discharge of certain debts. Venue is proper under 28 U.S.C. § 1409. Both parties have consented to this Court's authority to enter a final order. (ECF Nos. 21 and 23). Determining the scope of a debtor's discharge is a fundamental part of the bankruptcy process. *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 312 (Bankr. N.D. Tex. 2011). As the *Farooqi* court explained:

> Congress clearly envisioned that bankruptcy courts would hear and determine all core proceedings, 28 U.S.C. § 157(b)(1), which include, as relevant here, "determinations as to the dischargeability of particular debts." 28 U.S.C. § 157(b)(2)(I). The Supreme Court has never held that bankruptcy courts are without constitutional authority to hear and finally determine whether a debt is dischargeable in bankruptcy. In fact, the Supreme Court's decision in *Stern* clearly implied that bankruptcy courts have such authority when it concluded that bankruptcy courts had the constitutional authority to decide even state law counterclaims to filed proofs of claim if the counterclaim would necessarily be decided through the claims allowance process.

*Id.* (citing *Stern v. Marshall*, 564 U.S. 462, 504 (2011)). Because this case involves a determination as to the dischargeability of particular claims, this Court has both statutory and constitutional authority to enter a final judgment.

---

[1] All statutory citations and references are to Title 11 of the United States Code unless otherwise noted.
[2] ECF No. 1. "ECF" denotes electronic case filing number.

## II. BACKGROUND

This case revolves around the actions and knowledge of Defendant, who is a real estate broker licensed in Texas. Defendant oversaw multiple companies: HAWS Holdings Group, LLC (a company holding real property), Realty AI Investment Holdings, LLC (an investment company) ("Realty AI"), and Carter Texas Realty, LLC (a real estate brokerage firm). [ECF No. 56 at 27].[3]

In May 2020, Plaintiff sought to purchase an interest in real property and improvements in Tempe, Arizona, which would complete the second portion of a tax deferred exchange under IRC Section 1031. [ECF No. 57 at 11, 28]. To further his hope of purchasing a 45% interest in the property located at 2331 West Alameda, Tempe, Arizona (the "Arizona Property"), Plaintiff was introduced to Christopher S. Haff, a business associate of Defendant with a criminal record.[4] Haff was to provide funding through Haff's company, Dragon Capital, LLC, and would volunteer his own initial capital contribution. [ECF No. 57 at 19, 28]. Pursuant to his discussion with Haff, Plaintiff agreed to wire the $685,291.40 purchase price to Realty AI, which is solely owned by Defendant. [ECF No. 57 at 28]. Plaintiff believed that Defendant's role was to hold Plaintiff's money until all funds from Haff and Dragon Capital were available to later be distributed to the closing escrow agent, Old Republic Title, located in Arizona. [ECF No. 57 at 28]. Plaintiff states that this was the sole authorized use of the funds. [ECF No. 57 at 28–29].

On May 28, 2020, Haff provided Plaintiff with the first version of a document titled "Agreement to Hold Funds in Escrow Pending Transfer of Collateral" ("Escrow Agreement") with Dragon Capital LLC acting as an "investor" and Realty AI acting as "paymaster." [Trial Def. Ex. 9]. This document had incorrect information on the parties and location, and thus was updated to

---

[3] The Trial Transcript includes ECF Nos. 56, 57, and 58.
[4] This Court took judicial notice of the criminal case against Christopher Haff in trial. [ECF No. 58 at 9].

3

include the proper location, parties, and signature lines for Dragon Capital and Plaintiff's names. [Trail Def. Ex. 11; ECF No. 57 at 23].

Prior to meeting Plaintiff, Haff became acquainted with Defendant through Haff's brother sometime in 2018. [ECF No. 56 at 25; Trial. Pl. Ex. 2]. Defendant testified that Haff sought out Defendant to review and bring deals back to Haff. [ECF No. 56 at 25]. On June 9, 2020, Haff approached Defendant to request he act as a "paymaster" agent in exchange for a commission of a disbursement that Haff would be receiving. [ECF No. 56 at 30]. Defendant testified that he understood his role was to "send off money as [Haff] requested." [ECF No. 56 at 30]. Defendant ultimately agreed to act as a paymaster pursuant to an agreement titled "Agreement to Hold Funds in Account for Joint Real Estate Investment" (the "Paymaster Agreement") which is dated June 10, 2020. [Trial Def. Ex. 12; Trial Pl. Ex. 2; ECF No. 56 at 34].

In relevant part, the Paymaster Agreement states:

> The Funds shall be maintained by Paymaster until the date of closing or within 5 business days if loan commitment does not fund for any reason. Any release of funds shall only be permitted with a notarized or personal signature of managing partner if joint venture Christopher Haff. The expected partial releases shall be for earnest money and or deposits…**(b) Paymaster, as a part of the consideration for its acceptance of this deposit, shall not, in the performance of its duties under this Agreement, be liable for any error of judgment, or for any acts or omissions done by it in good faith, or for any mistake of fact or law, or for any claims, demands, causes of action, losses, liabilities, damages, costs or expenses claimed or suffered by any party to this Agreement, except such as may arise solely and directly as a result of the Agent's own gross negligence or willful knowing misconduct**. Agent is hereby authorized to rely upon, and shall be protected in acting upon, any notice, request, waiver, consent, receipt, certificate, affidavit, authorization, power of attorney, trust agreement or other paper or document believed by Paymaster with common due diligence and with good faith to be genuine and what it purports to be."

[Trial Def. Ex. 12; Trial Pl. Ex. 2] (emphasis added).

4

Plaintiff agreed that his name was not included in this Paymaster Agreement and thus, Defendant likely had little awareness of Plaintiff's existence at this point. [ECF No. 56 at 86].

On July 10, 2020, Plaintiff wired the $685,291.40 to the Wells Fargo bank account for Realty AI. [ECF No. 57 at 28]. Plaintiff testified that he believed that he was to receive 40% interest in Arizona Property shortly after the transfer of this wire. [ECF No. 57 at 28]. At 3:14 P.M. on July 13, 2020, Defendant received the funds via Realty AI through Remittur 1031 Services Inc. [Trial Pl. Ex. 6]. The wire transfer confirmation specifically noted that the wired fund amount was for the benefit of Plaintiff for a "45% interest in 2331 W. Alameda Drive" and sent to Realty AI. [Trial Pl. Ex. 6].

On July 13, 2020, Defendant's attorney, Cameron Redding, emphasized his concern that the proposed transaction and fee arrangement with Haff was a fraudulent scheme, and cautioned Defendant to contact his bank upon receipt of the funds to confirm when the funds could no longer be taken back by the issuing bank. [Trial Pl. Ex. 20 at 2]. Defendant confirmed that he went to his bank to complete an international wire, but the bank inquired as to the name of the company who sent the funds and requested the EIN. [ECF No. 56 at 133]. Defendant informed the bank that Haff told him that PRC Acquisitions had provided the funds, despite PRC Acquisitions not being a party to the Paymaster Agreement. [ECF No. 56 at 134.] Defendant did not question any wire transaction because in his words, "I trusted Chris Haff that he was in control of the deal. I believed in Chris Haff." [ECF No. 56 at 134.]

Both parties stipulated at trial that between July 13, 2020 and August 28, 2020, Defendant made the following transfers:

- On July 15, 2020, Defendant transferred $20,000 to Pioneer Title Agency, Inc., $82,500.00 to Texas Bahamas Buddies, LLC, $30,000.00 to William Haff, $20,000 to himself, $60,000

5

to William Haff, $21,500 to Commercial Mortgage Citi Corp, $100,000 to Balfour Arlington-Whit Solicitors.

- On July 20, 2020, Defendant disbursed $20,000 to Driggs Title Agency and $46,782.00 to Texas Bahamas Buddies, LLC.

- On July 22, 2020, Defendant disbursed $10,000 to Old Republic Title, and another $10,000 the following day.

- On July 24, 2020, Defendant disbursed $100,000 to Balfour Arlington-Whit Solicitors.

- On August 4, 2020, Defendant disbursed $20,000 to Strongbow Partners and $29,500 to Catherine Cocke, the spouse of Chris Haff, and $20,000 to Pioneer Title Agency.

- On August 12, 2020, Defendant disbursed another $5,000 to Texas Bahamas Buddies and another $45,000 on August 14, 2020.

- On August 21, 2020, Plaintiff demanded over email that Haff and Defendant return the funds, but the funds were not returned.

- On August 21, 2020, Defendant received information that the funds he received on July 13, 2020 belonged to Plaintiff. Chris Haff admitted over email that the wired funds belonged to Plaintiff, stating, "We'll pay [Plaintiff] off and replace his funds with other funds." [Trial Pl. Ex. 9; ECF No. 56 at 111]. The following day, Defendant sends an email confirming the funds received belonged to Plaintiff. [ECF No. 56 at111].

- Nonetheless, on August 28, 2020, Defendant disbursed $27,000 to Catherine Cocke and $15,200 to RLT Enterprises LLC on September 2, 2020.

- On September 22, 2020, Defendant disbursed $45,000 to PSPTL LLC and $15,000 to Will Haff the following day.

- On September 23 and 24, 2020, Plaintiff requested over email that Defendant and Haff return the funds, but neither Defendant nor Haff returned the funds.

[ECF No. 56 at 86].

On October 5, 2020, Chris Haff died. [Trial Pl. Ex. 12]. The following year, on July 21, 2021, Plaintiff filed his complaint in the United States District Court for the Western District of Texas seeking to hold Defendant liable in the amount of $685,291.40 for (1) money had and received; (2) conversion; (3) theft; (4) unjust enrichment; and (5) attorney's fees. [ECF No. 6, Ex. E]. On July 25, 2022, Realty AI filed for chapter 7 bankruptcy in the Western District of Texas and Defendant individually filed for chapter 7 bankruptcy on December 14, 2021.[5]

Plaintiff filed this adversary proceeding on May 23, 2022 arguing that Defendant acted willfully and maliciously by "(1) wrongfully controlling the [Plaintiff's money], which denied [Plaintiff] of his right therein; (2) unlawfully appropriating the [Plaintiff's money]; and (3) failing to return the [Plaintiff's money] with no justification." [ECF No. 1 at 5]. Plaintiff is seeking a finding of nondischargeability in the amount of $685,291.40 pursuant to 11 U.S.C. § 523(a)(6) because Defendant "acted with the actual intent to cause injury to [Plaintiff] when he knowingly initiated the transfers of the [Plaintiff's money] for a purpose other than as intended." [ECF No. 1 at 6]. Defendant received his discharge on May 26, 2022. Trial on the merits to determine nondischargeability was held on October 23, 2023 through October 26, 2023, and this matter was taken under advisement.

---

[5] Case No. 21-51531-CAG.

### III. ANALYSIS

#### A. Legal Standard for § 523(a)(6)

Section 523(a)(6) excepts a debt "for any willful and malicious injury by the debtor to another entity or to the property of another entity" from a debtor's discharge. 11 U.S.C. § 523(a)(6). For an injury to be considered "willful," the injury must be "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62 (1998). "[R]eckless or negligent conduct by a debtor leading to an injury is insufficient." *In re Ozcelebi*, 640 B.R. 884, 905 (Bankr. S.D. Tex. 2022). While § 523(a)(6) generally sounds in torts, "it may apply to a broad range of conduct causing harm to people or property, subject to the limitation that the injury be 'willful and malicious.'" *In re Johnson*, No. 03-83255, 2006 WL 6507734, at *6 (Bankr. N.D. Tex. Feb. 8, 2006) (citing to 4 COLLIER ON BANKRUPTCY ¶ 523.12–523.12[2], at 523–92.2 to 523–92.3 (15th ed. Rev. 2005)). This exception is not "limited to physical damage or destruction" but may also include "harm to personal or property rights." *Ozcelebi*, 640 B.R. at 905. Following the Supreme Court's decision in *Geiger*, the Fifth Circuit held that for a debt to be nondischargeable, a debtor must have acted with the "(1) objective substantial certainty of harm or a subjective motive to cause harm." *Matter of Miller*, 156 F.3d 598, 606 (5th Cir. 1998). Plaintiff only argues that Defendant's actions were objectively substantially certain to cause harm.

To satisfy that standard, Plaintiff must show that Defendant "intentionally took action that necessarily caused, or were substantially certain to cause, the injury." *Id.* at 604. This standard recognizes "the evidentiary reality that defendants rarely admit malicious intent." *In re Powers*, 421 B.R. 326, 335 (Bankr. W.D. Tex. 2009). Thus, this Court's role is to "analyze whether the defendant's actions, which from a reasonable person's standpoint were substantially certain to

8

result in harm, are such that the court ought to infer that the debtor's *subjective* intent was to inflict a willful and malicious injury on the plaintiff." *Id.*

"Although federal law governs a debt's dischargeability, courts look to state law to determine whether a conversion has occurred." ***Trustmark Nat'l Bank v. Tegeler (In re Tegeler)***, 586 B.R. 598, 693 (Bankr. S.D. Tex. 2018) (quoting ***State Farm Mut. Auto. Ins. Co. v. Rodriguez (In re Rodriguez)***, 568 B.R. 328, 342 (Bankr. S.D. Cal. 2017)). "In Texas, 'conversion' is defined as 'the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights.'" ***In re DeVoll***, 266 B.R. 81, 95 (Bankr. N.D. Tex. 2001) (citing ***Bandy v. First State Bank***, 835 S.W.2d 609, 622 (Tex. 1992) (citations omitted)).

To successfully demonstrate conversion under Texas law, Plaintiff must satisfy the multi-part test: "(i) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (ii) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights; and (iii) the defendant refused the plaintiff's demand for the return of the property." *Id.* (citing ***Huffmeyer v. Mann***, 49 S.W.3d 554, 558 (Tex. App.—Corpus Christi 1979, no writ)). "Not every conversion satisfies the 'willful and malicious' requirement of § 523(a)(6), however, as no intent to convert is required. In other words, conversion may be innocent or technical, without willfulness or malice." ***In re Michelena***, 641 B.R. 325, 345 (Bankr. S.D. Tex. 2022). Thus, Plaintiff must show both "(1) that a conversion has occurred under Texas law; and (2) that the conversion is willful and malicious." ***In re Tegeler***, 586 B.R. at 342 (quoting ***In re Rodriguez***, 568 B.R. at 343).

9

### B. Parties' Contentions

The parties disagree *when* Defendant knew that Plaintiff's money was at stake. Defendant claims that he believed the funds were coming from Haff's companies: Dragon Capital, LLC or Texas Bahama Buddies. Defendant also stated that he was not aware that the funds were Plaintiff's percentage ownership downpayment, and argued that he was merely acting pursuant to Haff's direction. Defendant contends that he believed his sole role was that of paymaster, carrying out Haff's instructions, which is why he did not think that it was appropriate to question the transactions. Further, Defendant stated that he typically receives numerous real estate deals per day, and that he reasonably trusted Haff because he was the brother of Defendant's longtime friend, Will Haff. In the alternative, Defendant argues that if this Court were to find conversion of the full amount, such conversion was made in good faith and not done with any willful or malicious conduct sufficient to satisfy the Fifth Circuit's objective test.

Plaintiff argues that Defendant willfully and maliciously converted Plaintiff's funds, satisfying §523(a)(6)'s objective test. [ECF No. 56 at 11]. Plaintiff contends that Defendant exercised dominion and control over the funds and refused to return the funds when requested. [ECF No. 56 at 11]. According to Plaintiff, Defendant was a sophisticated party who was aware that Plaintiff's money was at stake, but deliberately looked the other way to benefit his financially-distressed companies (Realty AI, HAWS Asset Holdings Group, LLC, and Carter Texas Realty). [ECF No. 56 at 27]. Plaintiff testified that he suffered a financial injury when his money was disbursed without his authorization. [ECF No. 57 at 31].

Plaintiff argues that Defendant's conversion was substantially certain to result in harm because Defendant knew that his wires, one of which was $100,000 to a firm in the Bahamas, another for the buildout of an office, and another for consulting, were substantially certain to

disappear and harm would result because the wires were not delineated as "for escrow" or "for deposit." [ECF No. 56 at 92]. While Plaintiff and Defendant both submitted a substantial amount of evidence, the Court gives the greatest weight to the following two pieces of evidence.

First, Haff sent an email on August 21, 2020 stating that he "will pay off" Plaintiff and "replace his funds with other funds" (the "Admission Email") [Trial Pl. Ex. 9]. Defendant was copied on this email. Second, there is a wire transfer, dated July 13, 2020, that Defendant received through his company, which notated that the funds were for the benefit of Plaintiff. In this wire confirmation, the noted recipient information was "James A. Guse and Linda L. Guse/45% interest in 2331 W. Alameda Drive, Tempe, AZ 85282" through UMPQUA Bank in the amount of $685,291.40. [Trial Pl. Ex. 6]. The parties did not calculate how much money was disbursed after the Admission Email. However, the Court has calculated this sum to be $132,600.00, representing the total amount of funds disbursed after the Admission Email was received according to Realty AI's Escrow Book Balance Ledger. [Trial Pl. Ex. 3].

### C. Analysis of Legal Standard and Credibility Determination

This Court finds that Defendant converted Plaintiff's funds. First, Plaintiff owned and was entitled to possession of his $685,291.40. Second, Defendant refused Plaintiff's demand for the return of the funds. As to the third, whether Defendant assumed and exercised dominion and control over the funds in an unlawful manner, the record is clear on this element: Defendant repeatedly wired funds to parties not included within the contract, for far-fetched purposes, and for the benefit of other parties.

Moreover, the Court did not find Defendant to be a credible witness. Defendant often failed to directly address the questions asked. [ECF No. 56 at 36]. On numerous occasions, this Court

had to remind Defendant to answer Plaintiff's questions in "yes" or "no" format. [ECF No. 56 at 71]. Defendant also contradicted himself multiple times [ECF No. 56 at 81]. For example, Defendant testified that he believed he was under contract with Dragon Capital, which he believed to be a legitimate company. [ECF No. 56 at 56]. But Plaintiff later countered that Defendant had, inconsistent with this assertion, created a spreadsheet attributing the funds to Texas Bahamas Buddies [Trial Pl. Ex. 3; Trial Pl. Ex. 4]. On a different occasion, Defendant claimed he believed that the investors providing the funds were Dragon Capital, LLC, RLT Enterprise, or non-investor MariahCorp, LLC, all three of which he did not investigate, only to later testify that he believed the funds came from PRC Acquisitions, which was again contradicted by Defendant's own spreadsheets which indicated the funds were from Texas Bahamas Buddies. [ECF No. 56 at 56]. Defendant claimed this was merely a "clerical error" and "just something [he] overlooked at the time." [ECF No. 56 at 82].

This Court also finds that Defendant is a sophisticated party, and so should have been aware of the likelihood that his actions would harm Plaintiff. Defendant obtained a finance degree from University of Incarnate Word, managed a travel agency, and possessed a real estate license. [ECF No. 56 at 15]. Defendant testified that he went on to build multiple companies, overseeing and managing between 20 to 85 real estate agents at a time. [ECF No. 56 at 15]. Upon evaluating Defendant's testimony and demeanor, this Court finds it is more likely than not that Defendant's state of mind was exactly what he testified it to be at a later juncture: that he "was really trying to reorganize [his] debt anywhere that would look at it." [ECF No. 56 at 28].

Defendant repeatedly wired money pursuant to Haff's instructions. Defendant agreed that he wired thousands of dollars to various entities who were not parties to the Paymaster Agreement, but when asked who some of these entities were, Defendant's response was "no idea" and

"someone [Haff] was working with for his deals." [ECF No. 56 at 75]. Defendant indeed overlooked many clear warning signs that the funds he was delegated to carefully handle were not in fact owned by Haff, despite being a sophisticated agent who routinely handled such transactions. Thus, Defendant's actions were, at minimum, reckless.

But, the Supreme Court held in *Geiger* that recklessness alone does not fall under § 523(a)(6). Plaintiff needed to prove that Defendant intentionally and willfully converted Plaintiff's funds. Defendant's unease on the stand and testimonial inconsistencies are reasonably attributable to Defendant feeling nervous about a looming potential judgment that would normally be directed at Haff but could not be due to his death. Haff was a con man who preyed upon both Plaintiff's and Defendant's trust, and prior to the Admission Email, Defendant could have reasonably believed that nothing was amiss with the funds he was disbursing.

Defendant testified credibly that he did not question these interactions because Haff deliberately confused those around him to further his goals. Meanwhile, Defendant had a mounting debt problem he was desperately attempting to solve. Defendant's contradictory testimony and discomfort on the stand do not demonstrate that Defendant knew to a substantial certainty prior to the Admission Email that it was Plaintiff's money in the account. While Defendant was an uncomfortable and nervous witness, he was entirely consistent and credible in his testimony regarding his belief in Haff's representations. In this same vein, the Court will not ignore the Admission Email, which clearly establishes the time after which Defendant knew Plaintiff's money was at stake.

Thus, this Court will hold Defendant liable up to the amount wired after the Admission Email. Therefore, Plaintiff's Complaint is **GRANTED** and Plaintiff is awarded a nondischargeable

judgment in the amount of $132,600.00, which is the amount disbursed after the Admission Email is dated.

## D. CONCLUSION

In summary, Plaintiff satisfies the standard of § 523(a)(6). Plaintiff is GRANTED IN PART a nondischargeable judgment in the amount of $132,600.00. Plaintiff further seeks a nondischargeable determination for unpaid attorney's fees (both pre- and post-petition) and associated costs in pursuing a determination of nondischargeability of its debt. Federal Rule of Civil Procedure 54(d)(1) and Local Rule 7054 require that a request for attorney's fees and costs be made by separate motion. As such, it is ORDERED, ADJUDGED, and DECREED that:

Plaintiff has a nondischargeable debt under 11 U.S.C. § 523(a)(6) for $132,600.00.

Plaintiff shall have 14 days from entry of this Opinion to file its Motion pursuant to Federal Rule of Civil Procedure 54(d)(1) and Local Rule 7054 for its accrued attorney's fees and costs.

Plaintiff shall prepare and file with the Court a proposed form of judgment consistent with this Opinion within 7 days of entry of this Opinion.

IT IS FURTHER **ORDERED** that all other relief is **DENIED**.